IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

TODD W. ION                                                     PLAINTIFF

v.                                     CAUSE NO. 1:11CV124 LG-RHW

CHEVRON USA, INC.                                      DEFENDANT

### MEMORANDUM OPINION AND ORDER
### GRANTING MOTION FOR SUMMARY JUDGMENT

BEFORE THE COURT is the Motion for Summary Judgment [27] filed by Chevron USA, Inc. The Plaintiff has responded in opposition, and Chevron has replied. After due consideration of the submissions and the relevant law, it is the Court's opinion that there is no question of material fact for the jury in regard to Plaintiff's retaliation claim. The Motion will therefore be granted and the retaliation claim dismissed.

### THE ALLEGATIONS OF THE COMPLAINT

Plaintiff Todd Ion worked as a lab chemist at the Chevron Pascagoula Refinery beginning in November 2006. He was suspended for five days for alleged performance reasons, and was to return on Monday, March 23, 2009. On the Friday prior to his scheduled Monday return, he contacted Chevron's Employee Assistance Program. He was referred to a licensed professional counselor, who saw him the next day. Ion alleges he informed his supervisor on the day scheduled for his return that he was under the care of a counselor and would be taking leave for more than three days because of "emotional, financial and psychological stressors in [his] personal and family life." He alleges he submitted certification of his need for leave

to Chevron, and that the information he provided was sufficient for Chevron to designate his request for leave as qualifying for the FMLA. Chevron terminated his employment on April 2, 2009. He contends that his termination was based on having taken FMLA leave, interfered with his right to take FMLA leave and be reinstated on his return, and "was a willful, wanton violation of his rights to FMLA leave." (Compl. 2 (¶15-17), ECF No. 1).

### THE MOTION FOR SUMMARY JUDGMENT

Chevron has moved for summary judgment, arguing that Ion has made one claim - for retaliation claim under the FMLA - and that claim cannot survive its legitimate, nondiscriminatory reasons for terminating him. The parties disagree about the scope of Ion's FMLA claims, as he contends he has made substantive interference and discrimination claims in addition to the retaliation claim.

Under the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq., employers have a prescriptive obligation - they must grant employees substantive rights guaranteed by the FMLA - and they have a proscriptive obligation - they may not penalize employees for exercising these rights. *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 763 (5th Cir. 2001). Ion's claims implicate both, in that he contends Chevron interfered with his right to take FMLA leave and be reinstated – violations of his prescriptive rights – and he was terminated because he exercised his right to FMLA leave – a violation of his proscriptive rights. (Compl. 2 (¶15-17), ECF No. 1). Ion is not required to establish a violation of the substantive, prescriptive provisions of the FMLA to allege a violation of the proscriptive

-2-

provisions.

Chevron's summary judgment motion addressed only the retaliation claim because Chevron interpreted the Complaint to make only that claim. Chevron did not acknowledge the interference claim until it replied to Ion's response. Even then, Chevron did not address whether Ion had established a *prima facie* case of interference, which requires him to show that his leave was protected under the FMLA. *See Ford-Evans v. United Space Alliance LLC,* 329 F. App'x 519, 523 (5th Cir. 2009). Chevron only attacked the reasons Plaintiff alleges he was terminated. As this issue was raised and briefed, the Court will consider Chevron's Motion for judgment as a matter of law regarding Ion's retaliation claim.

### THE SUMMARY JUDGMENT EVIDENCE

The parties have provided records of Ion's employment showing Chevron's growing concern with his attendance and job performance. His performance review for 2008 noted a number of performance deficiencies. (Def. Mot. Summ. J. Ex. 6, at 3, ECF No. 27-6). He received a score of 2-, meaning he marginally met performance expectations. (*Id*.). Ion's supervisors at the time were Steve Ogborn, chief chemist, Vince Dressler, lead chemist, and Rich Kerns, laboratory supervisor.

Near the end of February 2009, Ogborn spoke with a Human Resources employee about Ion. According to an email from the HR employee to Johnette Watson, an HR manager,"[t]hey have reviewed [Ion's] gate records because of concerns there and have other current performance concerns. With the combination of events they are likely looking at suspension and [Attendance Improvement Plan]

but in weighing it all the recommended action may be to go beyond suspension." (Pl. Resp. Ex. 3, ECF No. 37-3; Def. Mot. Summ. J. Ex. 7, at 10, ECF No. 27-7). Watson testified that she had discussed Ion's attendance and performance issues with Ogborn the previous month. (Def. Mot. Summ. J. Ex. 7, at 10-11).

On March 16, 2009, Ogborn provided Ion with the Performance Agreement and Attendance Improvement Plan. (Pl. Resp. Ex. 4, ECF No. 37-4). This three-page document detailed Ion's performance deficiencies, including what it called "AWOL events" when he was absent from the Refinery without explanation. The document set out the Company's expectations and a method by which it would monitor Ion's progress toward meeting expectations. He received a five-day suspension without pay and was warned that failure to comply with the Plan upon his return would result in further disciplinary action. (*Id.* at 3).

Ogborn scheduled a meeting with Ion and Watson on March 23, Ion's first day back after suspension, but Ion called in sick. (Pl. Resp. Ex. 6, ECF No. 37-6). Another meeting was scheduled for the next day, but Ion also called in sick that day. During the phone call on the 24th, Ion informed Ogborn that he was "working on paperwork for short term disability." (Pl. Resp. Ex. 7, ECF No. 37-7). Ogborn told Ion to work with the clinic on that issue. (*Id.*). Ogborn also relayed this information to Watson, who recommended that Ogborn send an email to the clinic informing them and asking them to keep him informed as to when Ion would be back to work. (*Id.*).

Chris Melcher, a Technical Manager, received a copy of Ogborn's email to the

clinic. He responded that "[i]t looks like Mr. Ion is playing games with us after his suspension. I assume the 'paperwork for short-term disability' comment means he is looking for a doctor to give him some FMLA-qualified time off. What are our options moving forward?" (Pl. Resp. Ex. 8, ECF No. 37-8). It appears on the same day, Chevron received a Certification of Health Care Provider form completed by a Licensed Professional Counselor on Ion's behalf. (Pl. Resp. Ex. 5, ECF No. 37-5). According to the Counselor, Ion was incapacitated as of March 23 and unable to perform work of any kind. The medical facts supporting the certification were: "too much stress – can't focus on his job – single parent." (*Id*. at 1). The duration of his incapacity was "undetermined." (*Id.*).

Also on March 24, the clinic nurse sent Ion an email informing him that she had sent FMLA paperwork to him in the mail, but that he needed to report to the clinic to complete a "GO-153 form." (Pl. Resp. Ex. 9, ECF No. 37-9).

On March 25, Ion's co-worker, James Peel, sent an email to Ogborn relating an incident with Ion. He had spoken to Dressler about it, who requested that Peel send an email to Ogborn. Peel stated:

> A couple of weeks ago, 3/12, Todd returned to our shared office in an angered state of mind. He openly shared with me his frustrations regarding a meeting he had with Steve [Ogborn] and Vince [Dressler]. The subject of his meeting was attendance. He spoke of quitting his job. Then he mentioned faking a nervous breakdown related to his divorce so he could take a leave of absence with FMLA and EAP benefits. He also boasted about how he could get paid for being at home.

(Pl. Resp. Ex. 10, ECF No. 37-10). He stated in his deposition that he,

> went to Vince [Dressler] after I thought about it for a while. . . . But I sat on it and I didn't want to say anything because I feared that, you know, something bad would happen and Todd would get fired or whatever. But it festered on me like a wound that – I have a problem, a philosophical problem with doing somebody else's work when I know they're sitting home sipping beers watching Oprah or The View or whatever.

(Def. Mot. Summ. J. Ex. 9, at 22, ECF No. 27-9).

On the same day, Ion went into the clinic as requested by the clinic nurse. His behavior while there made the nurses uncomfortable enough that three of them went to Ogborn to tell him about it. (Def. Reply Ex. A 96, ECF No. 39-1). Ogborn recorded their observations in a note to the file:

> Todd came to the Refinery this morning to sign a GO 153 as requested by HR. Upon arrival he refused to sign the form stating that the EAP Rep (Tina) said that he didn't need to sign the form. Todd asked the Clinic personnel many HR questions regarding policies and pay of which they didn't know the answers to and repeatedly referred him to HR.
>
> . . .
>
> The Clinic personnel also mentioned that Todd has been calling for the last several days asking HR policy questions and FMLA paperwork questions.
>
> His demeanor, as described by the clinic employees, was "passive/aggressive harassment" and he made the clinic employees feel uncomfortable. They also said he appeared disgruntled and angry and mentioned that he didn't trust them. He was asked to leave but tried to circumvent leaving by getting another clinic employee (Susan) to take him to Tina's office even after he was told that Tina wasn't in today. Susan wasn't aware of the situation until after she got back from Tina's office with him.
>
> Todd did eventually leave without signing the GO 153. He asked for and took copies of [certain policies].

(Pl. Resp. Ex. 11, ECF No. 37-11).

Ogborn later added a related matter to the note, after checking with the receptionist about Ion's visitor badge. The receptionist told him that "upon leaving [Ion] walked past the receptionist without turning in the badge. [The receptionist] had to stop him and request that he return the visitors badge. She mentioned that he seem [sic] mad that he had to return the badge." (*Id*.).

On March 26, Ion called in sick. He told Ogborn that he had submitted the FMLA paperwork and would be out of work until April 27. (Pl. Resp. Ex. 14, ECF No. 37-14).

On April 2, 2009, Ogborn sent a letter to Ion advising him that his employment with Chevron had been terminated for "an abuse of management constituting insubordination." (Pl. Resp. Ex. 15, ECF No. 37-15). Ogborn explained the events constituting insubordination:

> On March 16, 2009, you were put on a Performance Improvement Plan, received a 5 day suspension and given a final warning for poor performance and behaviors, being absent without leave and falsification of time records. When you left our meeting to go to your office to collect some personal belongings, you also took Chevron company equipment (laptop, blackberry, Chevron credit cards, etc.), cleaned out all your personal belongings and indicated your anger to your office mate. On March 25th we learned you had previously stated to this same office mate that you would fake a nervous breakdown related to your personal situation so you could get paid for being at home. You haven't returned to work since your suspension.
>
> Based on your overall performance, the seriousness of the policy violations and your behavior following the March 16th discussion, Chevron management has decided to end your employment effective immediately.

(*Id*.).

Ion testified he did not recall any negative items being discussed during his performance review. (Def. Mot. Summ. J. Ex. 1, at 37:19-24, ECF No. 27-1). He testified that they went over the performance review on the computer, and the information appearing on it now was not written at that time. (*Id*. at 24:4-7). He further testified that some of the items had been discussed with him either at an informal pre-review meeting, or after his review. (*Id*. at 25, 37). For example, he recalled Ogborn calling him in for a meeting on March 11, 2009 about his unexcused absences from the Refinery. (*Id*. at 92). And on March 16, he read and signed the Performance Agreement and Attendance Improvement Plan, which noted all of the same deficiencies. (*Id*. at 128; Pl. Resp. Ex. 4, at 3, ECF No. 37-4). He testified he had "come to believe" that Chevron was in a hurry to terminate him because they knew he might try to move to another state to be closer to his son at the same time another of the three chemists would be out on maternity leave. (Def. Mot. Summ. J. Ex. 1, at 148-49, ECF No. 27-1; Ex. 2, at 88-93, ECF No. 27-2). In his view, in order to avoid this situation, Chevron found a way to terminate him earlier and get his replacement in place prior to the planned maternity leave. (*Id*.).

## FMLA RETALIATION

Ion argues that Chevron retaliated against him for applying for and beginning FMLA leave, and improperly used his FMLA leave as a factor in terminating him. He argues that Ogborn's letter shows that his FMLA-protected absence was at least a factor in his termination, and therefore the Court should apply a mixed-motives analysis.

"When a plaintiff alleges mixed-motive retaliation (i.e., that discrimination was not the sole reason for discharge but was a motivating factor)," the court may apply the "mixed-motive" framework. *Crouch v. J.C. Penney Corp., Inc.*, 337 F. App'x. 399, 401 (5th Cir. 2009). This framework provides:

> (1) the employee must make a *prima facie* case of discrimination; (2) the employer must articulate a legitimate, non-discriminatory reason for the adverse employment action; and (3) the employee must offer sufficient evidence to create a genuine issue of fact either that (a) the employer's proffered reason is a pretext for discrimination, or-and herein lies the modifying distinction-(b) that the employer's reason, although true, is but one of the reasons for its conduct, another of which was discrimination. If the employee proves that discrimination was a motivating factor in the employment decision, the burden again shifts to the employer, this time to prove that it would have taken the same action despite the discriminatory animus.

*Crouch*, 337 F. App'x. at 401 (citing *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005)). The mixed-motive framework is applicable to FMLA claims. *Richardson*, 434 F.3d at 334.

In its summary judgment motion, Chevron assumes that Ion has established his *prima facie* case and moves on to the next step in the mixed-motive analysis by articulating its legitimate, nondiscriminatory reasons for terminating him. Those reasons were Ion's unexcused absences from work, his poor performance while at work, his statements to Peel regarding faking a nervous breakdown in order to obtain leave, his removal of Chevron property from his office, and his behavior toward the clinic employees.

These are all legitimate nondiscriminatory reasons for termination, and accordingly, the burden shifts back to Ion to show by a preponderance of the

evidence that the reasons presented by Chevron is merely a pretext for retaliation, or that Chevron's reasons, although true, are but some of the reasons for its conduct, another of which was discrimination.

Ion contends he can show that Chevron's true reason for terminating him was retaliation for taking FMLA leave. First, the language in the termination letter regarding insubordination could only refer to his refusal to sign the GO 153 form. Second, the termination letter states "You haven't returned to work since your suspension." (Pl. Resp. Ex. 15, ECF No. 37-15).[1]

Ion contends that Chevron's requirement that he sign the GO 153 form was a violation of FMLA, because Chevron was not entitled to a release of his medical information. Once Ion submitted a complete certification signed by the health care provider, Chevron was prohibited from requesting additional information. 29 C.F.R. § 825.307. He connects the reference to insubordination to his refusal to sign this form, but without any evidence. None of the Chevron officials involved attached any significance to Ion's refusal to sign the GO 153. Ogborn testified that the matter was not part of the insubordination referred to in the termination letter. (Def. Reply Ex. A 95, ECF No. 39-1). Johnette Watson testified that his refusal to sign the form was not a reason he was terminated. (Def. Reply Ex. B 54, ECF No. 39-2). It did not matter to her whether he signed the form because he had been

---

[1] Ion also claims that Chevron deviated from its progressive discipline system in terminating him, but he provides no evidence of what the system consists of. The Court is therefore unable to evaluate this argument.

terminated. (*Id*.). In the Court's view, Ion only speculates that his refusal to sign the form was the insubordination referred to in the termination letter, when what was actually considered to be insubordination was included in the letter. Ion's speculation about what Chevron meant is insufficient to show that one of Chevron's reasons for terminating him was FMLA retaliation. *See Waggoner v. City of Garland*, 987 F. 2d 1160, 1164 (5th Cir. 1993).

Ion next notes Ogborn's sentence in the termination letter that "You haven't returned to work since your suspension." Ion contends this shows that his absence was a reason for his termination. Ogborn testified that "You haven't returned to work since your suspension" was not a reason Ion was terminated, but simply a statement of fact. (Def. Reply Ex. A 114, ECF No. 39-1). It appears in the letter at the end of a narrative recounting the events leading up to the termination. (Pl. Resp. Ex. 15, ECF No. 37-15).

The Court agrees that a reasonable jury could conclude that this mention of Ion's absence from work, in the litany of other complaints about his actions, showed that Chevron considered FMLA protected leave in terminating him. Accordingly, the burden again shifts to Chevron, this time to prove that it would have taken the same action despite the discriminatory animus.

Chevron is able to show that it would have taken the same action against Ion. As set out above, Chevron began the disciplinary process against Ion well before he applied for FMLA leave. During Ion's suspension, Ogborn was advised of two other incidents that gave him cause for concern when James Peel and the clinic

nurses approached him about Ion.  Although Ion argues he did not say to Peel the things Peel told Ogborn he did, nor did he do anything to make the nurses uncomfortable, the proper inquiry is whether Chevron reasonably believed and relied on the information received from these employees in good faith.  *See Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010).  Ion provides no evidence that Chevron's reliance on the reports of these employees was in bad faith.  Thus, Chevron has shown that it would have terminated Ion even if he had not applied for FMLA leave.  Accordingly, Ion's FMLA retaliation claim does not present a question of material fact for the jury.  Chevron's motion for summary judgment on this claim will be granted.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Motion for Summary Judgment [27] filed by Chevron USA, Inc. is **GRANTED**.  Plaintiff's claim of retaliation under the Family Medical Leave Act is **DISMISSED WITH PREJUDICE**.

**SO ORDERED AND ADJUDGED** this the 11th day of April, 2012.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
CHIEF U.S. DISTRICT JUDGE